UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 06-415-KSF

IN RE LODESTAR ENERGY, INC., *et al.*        BANKRUPTCY NOS. 01-50969/01-50972

LARRY B. PINSON, *et al.*                                                    APPELLANTS

V.                                    **OPINION & ORDER**

WILLIAM BISHOP, TRUSTEE                                              APPELLEE

* * * * * * * * * * * * *

        This matter is before this Court for the second time on appeal.  This case involves an

adversary proceeding in the bankruptcy of Lodestar Energy, Inc., and Lodestar Holdings, Inc.,

(collectively referred to as "Lodestar") brought by appellants Larry B. Pinson, Gayle Pinson, and

Robert D. Pinson (collectively the "Pinsons") against the appellee Chapter 7 Trustee, William

Bishop (the "Trustee").[1]  The central question in this appeal is what, if anything, the Pinsons are

entitled to under a settlement agreement and lease entered into between the parties post-petition.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

        A.      **Factual Background**

        Prior to March 30, 2001, Lodestar unintentionally mined coal on the Pinsons' land.

When Lodestar discovered that it was engaged in unauthorized mining, it promptly stopped the

mining and contacted the Pinsons.  The parties commenced negotiations, which culminated in a

_____

        [1]        The Trustee was appointed to represent the Lodestar bankruptcy estate and is
technically the party on appeal, not Lodestar.  However, for ease of reference, the Court will use
the term "Lodestar" to also refer to the estate and/or the Trustee, except where otherwise
provided.

settlement agreement and lease signed after 5:00 p.m. on March 30, 2001 (collectively the "Agreement").  However, unbeknownst to either party, an involuntary bankruptcy case had been commenced against Lodestar at 4:01 p.m. on that same date.

The Agreement actually consisted of two agreements – one was a "Settlement Agreement," which provided that Lodestar would pay the Pinsons $1.25 million to compensate them for the coal already taken without permission.  Appended as Exhibit A to the "Settlement Agreement" was an "Underground Coal Lease," which permitted Lodestar to continue to mine on and transport coal across the Pinsons' property in the future in exchange for royalties and wheelage payments.  On the date of the Agreement, which is also the petition date, Lodestar paid the Pinsons $300,000 toward the total $1.25 million settlement amount for the coal already mined.  Additional payments were to be made in monthly installments until December of 2001, at which point the entire $1.25 million would have been paid.

Although it continued to mine and haul coal on the Pinsons' property, Lodestar did not make any of the additional installment payments and on July 24, 2001, the Pinsons filed a proof of claim for $950,000 (the difference between the total $1.25 owed under the Agreement and the $300,000 paid on the date the Agreement was executed).  On May 24, 2002, the Pinsons filed a motion for allowance of administrative priority requesting that the bankruptcy court enter an order treating their claim for the remaining amount (separate and apart from the coal lease) as a priority "gap" claim pursuant to 11 U.S.C. §§ 502(f) and 507(a)(2) or, in the alternative, as an administrative expense under 11 U.S.C. §§ 503(b) and 507(a)(1).[2]  The bankruptcy court denied

_____

[2]       The parties do not discuss which version of the Bankruptcy Code applies, but the Court assumes that the version in effect as of the date of the involuntary petition applies.

the Pinsons' motion by order entered July 30, 2002, concluding that the Pinsons' claim was a

pre-petition, general unsecured claim which arose when Lodestar conducted mining operations

on the Pinsons' land without permission.   The bankruptcy court ultimately concluded that the

Pinsons' claim "is not entitled to priority as a 'gap' claim pursuant to 11 U.S.C. §§ 502(f) and

507(a)(2)" and "[t]he Pinsons' claim for the Settlement Amount [which the bankruptcy court

considered as separate from the coal lease] is not an administrative expense for purposes of 11

U.S.C. §§ 503(b)(1)(A) and 507(a)(1)."

      **B.**    <u>**First Appeal**</u>

The Pinsons appealed to this Court challenging the bankruptcy court's rulings.   <u>Larry</u>

<u>Blake Pinson, *et al.* v. Lodestar Energy, Inc., *et al.* (In re Lodestar Energy, Inc., *et al.*)</u>, Civil No.

02-471-KSF (E.D. Ky.) (hereinafter the "First Appeal").   While on appeal, Lodestar's bankruptcy

case was converted from one under Chapter 11 to one under Chapter 7 in July of 2003.

Relying on what it viewed as the analogous cases of <u>In re Merry-Go-Round Enterp., Inc.</u>,

180 F.3d 149 (4th Cir. 1999), and <u>In re Texaco Inc.</u>, 254 B.R. 536 (Bankr. S.D.N.Y. 2000), this

Court held in an opinion and order entered August 26, 2003, that the bankruptcy court erred in

considering separately the provision in the Agreement regarding the monetary payment for coal

already mined and the lease for coal yet to be mined.   Lodestar's choice to continue mining under

the terms of the Agreement constituted an assumption of the lease, rendering it functionally

analogous to a post-petition lease.   The Court held further that the agreed-upon installment

payments for the illegal mining served as additional consideration for the Pinsons having entered

into the Agreement.   In other words, this Court held that the Trustee could not opt to assume the

benefits of the lease portion of the Agreement, but ignore its obligations under the settlement

-3-

portion that served as consideration giving rise to the Agreement. "Allowing [Lodestar] to enjoy the fruits of the lease while ignoring the concomitant obligations giving rise to the lease would be inequitable" under In re United Trucking Service, Inc., 851 F.2d 159 (6th Cir. 1998).

The Court ultimately determined that Lodestar's debt under the Agreement qualified as an actual and necessary administrative expense because it arose from a transaction with the estate when Lodestar chose to assume the lease. It remanded the case to the bankruptcy court and ordered that "the lease, executed post-petition and assumed post-petition, requires payment under the terms of the settlement agreement and is thus entitled to administrative priority in an amount determined consistent with the approach in *In re United Trucking*."

### C.    **Bankruptcy Court's Ruling After Remand**

After remand, the bankruptcy court held a hearing regarding the treatment of "Tier 3" claims[3] (of which the Pinsons' claim was one) and the parties thereafter supplied supplemental briefs regarding the treatment of the Pinsons' claim in particular. The bankruptcy court noted that the analysis under United Trucking was not based on the inducement exercised by the debtor (here, Lodestar) to cause the creditor (here, the Pinsons) to supply goods or services (here, the lease). According to the bankruptcy court, United Trucking required it to look to "the reasonable value of the benefits conferred."

_____

[3]    Pursuant to the terms of a global settlement reached after months of mediation efforts and approved by the bankruptcy court, all allowed and unpaid Chapter 11 administrative claims were divided into tiers. Tier 1 claims include costs and expenses associated with the administration of the estate. Tier 2 claims include those incurred from December 11, 2002, through July 15, 2003. Tier 3 claims include those incurred from April 27, 2001, through December 10, 2002. Tier 1 and 2 creditors would be paid in full, while any remaining funds would be distributed *pro rata* to any Tier 3 claimants. There appears to be a total of $1 to 1.4 million available for Tier 3 claimants. Tier 4 claims include pre-petition and other claims; there apparently will be no funds for Tier 4 claimants.

The bankruptcy court noted that all amounts for mining and wheelage were paid on a current basis post-petition.  It also concluded that the $300,000 paid to the Pinsons upon execution of the Agreement was paid in consideration of the settlement of the pre-petition claim for illegal mining and to induce the Pinsons to enter into the lease to mine coal going forward. The bankruptcy court then concluded that the difference between the $1.25 million in consideration for the illegally-mined coal and the $300,000 already paid – $950,000 – could only logically be attributed to payment for the previously-mined coal.  Under United Trucking, any coal mined pre-petition could not have provided any value to the estate post-petition.  Thus, any amount claimed beyond the $300,000 already paid conferred no actual value on the estate, so the value of any such administrative claim is zero.

The bankruptcy court also concluded that the Pinsons' reliance on cases including In re Merry-Go-Round Enterprises, Inc., 180 F.3d 149 (4th Cir. 1999) – a case that this Court relied upon in the First Appeal – was misplaced because, unlike those cases, neither party in the present case knew that Lodestar was dealing with a Chapter 11 debtor when entering into the Agreement. Therefore, the policy undergirding those decisions is not implicated in the present case.  The bankruptcy court also did not agree with the Pinsons that this Court had, on the First Appeal, "determined that the Pinsons' entire claim [was] entitled to administrative priority."  Therefore, it concluded below that "the $950,000.00 claimed by the Pinsons is not entitled to administrative priority under section 503(b), [and] it [was] unnecessary to address the Pinsons' argument that the sum [was] entitled to Tier 2 status."  This timely appeal followed.

## II.  THE PARTIES' ARGUMENTS

### A.  Appellant Pinsons' Opening Brief

The Pinsons assert that the bankruptcy court erred in bifurcating their administrative claim, particularly when this Court made it clear that such bifurcation was improper when it said the following:

> [T]here is no reason to distinguish [Lodestar's] obligations under the coal lease from it's [sic] obligation to make monetary payment under the settlement agreement.  There is no evidence in the record indicating that the settlement agreement and the coal lease were to be construed independently; instead, the mining lease includes an Integration Clause, Clause 15, rendering the failure to pay sums due under the settlement agreement a breach of the lease.

(Opinion & Order, at p.4 (footnotes omitted).)  The Pinsons argue that this Court did not remand the matter to the bankruptcy court for calculation of the administrative claim, but for payment of the entire amount of money that remains due under the Agreement, based on In re Merry-Go-Round.  Under the integration clause, the estate still had an obligation to pay the remaining $950,000, and each scheduled payment became an administrative claim once it was due.

The Pinsons rely on several cases holding that failure to reject a post-petition lease leads to an administrative expense for the entire remaining term of the lease.  Pursuant to the rationale of the Sixth Circuit in United Trucking, the entire post-petition period is entitled to administrative priority for the entire amount of the obligation.  Lodestar used the property to generate income for the estate and had the potential to generate more income for the estate, so there was a direct and substantial benefit to the estate.

The fact that the parties did not know of the bankruptcy when negotiating the lease should not make a difference, the Pinsons argue.  All of the cases contemplating post-petition leases

-6-

have rejected the argument that the administrative claim should be recalculated in retrospect to determine the benefit to the estate. Courts should not look backward at what occurred in the case (in this case, the mine closed during the pendency of the lease), but whether the rights Lodestar acquired under the Agreement constituted a benefit to the estate.

In this case, the Agreement called for not only the initial $300,000 payment, but also additional installment payments to be paid as part of the comprehensive settlement. In order for Lodestar to continue to hold the property and mine coal on the property, it was required to make those additional payments. The Trustee cannot sever the obligations it made to acquire the coal lease and continue to have the benefit of the coal lease. Because the Agreement was one unified post-petition transaction, Lodestar should be required to pay the post-petition obligations on an administrative basis.

### B.       Appellee Lodestar's Response Brief

Lodestar argues that the only matter the bankruptcy court considered on remand after the First Appeal was the factual question of the amount of the Pinsons' allowed administrative claim, which it contends was properly determined to be nothing beyond the $300,000 already paid to the Pinsons post-petition. The Court's remand order required the bankruptcy court to determine the amount of the administrative claim in accord with United Trucking, and Lodestar argues that the bankruptcy court "followed this directive precisely."

United Trucking required the bankruptcy court in this case to allocate the Pinsons' total claim as between the pre-petition claim amount and the administrative claim amount. This is a factual determination that was not clearly erroneous. The bankruptcy court's determination that $950,000 of the Pinsons' claim was attributable to damages for pre-petition unauthorized mining

is supported by the facts and the language of the Agreement.  Lodestar argues that the Agreement does not address any allocation, but the bankruptcy court determined that only $300,000 of the total $1.25 million settlement amount should be allocated to the inducement to enter into the post-petition lease and continued mining, since the lease specifically stated that mining could not commence until that payment had been made.

Lodestar paid all post-petition actual coal and wheelage royalties in the ordinary course of business as they came due post-petition.  According to Lodestar, this further supports the bankruptcy court's finding that the $950,000 due for coal mined pre-petition did not confer any actual value on the estate post-petition.  Thus, there was no portion of the remaining $950,000 due that could be allocated to administrative claim status.  Because this finding is not clearly erroneous, it should be affirmed.

The bankruptcy court also properly took into consideration the unique circumstances in this particular case and the interest of all valid claimants.  It also properly construed this administrative claim narrowly, as is required.  The bankruptcy court properly analyzed the equities of this specific situation and reached the proper conclusion.[4]

C.     **Appellant Pinsons' Reply Brief**

The Pinsons reply that the bankruptcy court incorrectly interpreted the United Trucking case as well as this Court's opinion and order in the First Appeal.  In the present case, the entire obligation arose post-petition and the payments due under the Agreement (both the settlement

---

[4]        Lodestar also argues that if the bankruptcy court should be reversed, the Pinsons' claim should not be afforded Tier 2 status simply because some of the settlement payments became due during the Tier 2 timeframe.  None of the remaining $950,000 claim came due during the Tier 2 timeframe in any event, according to Lodestar.

agreement and the coal lease) were due and owing in order for Lodestar to have the continued ability to mine the coal and to exercise wheelage rights. The fact that these payments – which Lodestar was required to pay in order to obtain and maintain the lease – were for pre-petition activities is irrelevant.

The installment payments were part of the Agreement. The plain language of the Agreement states that there was no right to mine unless *all* of the monies due are paid. Thus, it was arbitrary for the bankruptcy court to determine that only $300,000 of the total $1.25 million was for the inducement to enter the lease for the right to mine. Had Lodestar not agreed to make these payments totaling $1.25 million, they would never have benefitted by nearly $8.7 million for the coal subsequently mined.[5] There is no dispute that Lodestar would never have had the lease – and the estate would never have benefitted – had it not also entered into the Agreement, which included the entire $1.25 million due for past mining activities.

Lodestar's argument that administrative claims should be construed narrowly ignores the fact that this Court has already subjected the Agreement to strict scrutiny and found that the Pinsons' claim is entitled to administrative claim status. Regardless of the fact that the parties did not know of the involuntary bankruptcy when they executed the Agreement, Lodestar took post-petition advantage of the Agreement to mine and haul coal to the tune of $8.7 million, but ignored its post-petition obligations requiring payment of the remaining $950,000.

As to which tier their claim belongs in, the Pinsons argue that because the Agreement was never rejected, it remained an asset of the estate at the time of conversion of the case to Chapter 7

_____

[5]     This figure is disputed and is the subject of the Trustee's motion to strike, discussed below.

-9-

in July of 2003.  Approximately 61 days after conversion, the post-petition lease was rejected and all monies due post-petition came due.  Therefore, Lodestar's obligation was due and owing during the Tier 2 time period.

## III.    ANALYSIS

### A.    Standard of Review

Pursuant to 28 U.S.C. § 158(a)(1), this Court has jurisdiction to hear appeals from final orders of the bankruptcy court.  In re Valley-Vulcan Mold Co., 237 B.R. 322, 326 (B.A.P. 6th Cir. 1999).  This Court reviews factual findings under a "clearly erroneous" standard of review.  In re Caldwell, 851 F.2d 852 (6th Cir. 1988).  "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed."  In re Cook, 457 F.3d 561, 565 (6th Cir. 2006) (quoting In re Zaptocky, 250 F.3d 1020, 1027 (6th Cir. 2001)).  Conclusions of law are reviewed *de novo*.  Id.

The parties do not agree on the standard of review to be applied in this case.  The Pinsons contend that the bankruptcy court improperly bifurcated the Agreement in contravention of this Court's remand order, improperly reinterpreted the Agreement, and therefore this Court should review the bankruptcy court's ruling *de novo*.  Lodestar argues that the bankruptcy court did not, on remand, decide any matter of law and, thus, the only issue before the bankruptcy court was the factual determination of the amount of the Pinsons' allowed administrative claim.

### B.    Administrative Claim Status

Because this Court directed the bankruptcy court to review the Pinsons' administrative claim in light of In re United Trucking Service, Inc., 851 F.2d 159 (6th Cir. 1988), it helps to

examine that case in some detail.

### 1.   The *United Trucking* Case

United Trucking did not involve a lease entered into post-petition.  Rather, it involved an

eight-year equipment lease entered into pre-petition; United simply continued to possess the

equipment post-petition.  Shortly after United filed for Chapter 11 protection, the lessee (TRC)

filed a petition in bankruptcy court to require United to either assume or reject the lease.  United

failed to respond and TRC sought information regarding the equipment's condition.  United

failed to produce the equipment for inspection, which was deemed a rejection of the lease.

United eventually returned the majority of the equipment to TRC.  At that point, TRC

filed an application for administrative expenses in the amount of approximately $100,000 related

to repair and replacement of the equipment.  The bankruptcy court allowed an administrative

expense of approximately $72,000 and the district court affirmed.

On appeal, the Sixth Circuit noted that the test in In re White Motor Corp., 831 F.2d 106

(6th Cir. 1987), which focused on a debtor's *post*-petition inducement of a creditor's

performance, was not applicable to the situation presented in United Trucking because United

did not – *post*-petition – induce any action by TRC.  It merely continued to possess the

equipment pursuant to a *pre*-petition contract.  United Trucking, then, seems to suggest that

when a *post*-petition action brings about liability, "the proper focus [is] on the inducement

involved in causing the creditor to part with its goods or services."  Id. at 162.

> In contrast, this case [United Trucking] involves a claim arising from United's
> post-petition continued use of leased equipment that allegedly was not in
> accordance with the terms of the pre-petition lease agreement.  We therefore do
> not believe the key inquiry is on inducement as in *Mammoth Mart, Jartran,* and

*White Motor.*

Id.  Instead, the Sixth Circuit adopted a test articulated by the Second Circuit and held that

> [t]he right to priority in the event the trustee or debtor in possession receives benefits under the [executory] contract during the interval between the filing of the debtor's petition and the rejection of the contract "is an equitable right based upon the reasonable value" of the benefits conferred, rather than upon the contract price.
>
>         . . . .
>
>         . . . .[T]he purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate, rather than the compensation of the creditor for the loss to him.

Id. (quoting American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A., 280

F.2d 119, 124, 126 (2d Cir. 1960)).  Thus, the Sixth Circuit held that any administrative expenses

for post-petition damages relating to a pre-petition executory contract "should reflect actual value

conferred on the bankrupt estate by reason of wrongful acts or breach of agreement."  Id. (citation

omitted).

Ultimately, the Sixth Circuit held that the district court had correctly treated at least part

of TRC's post-petition damages claim as an administrative expense.  By failing to maintain and

repair certain of the equipment, as required by the lease, United was able to save the money and

use it to continue operations.  Thus, "[t]his breach and misuse of TRC's trailers did benefit the

bankrupt estate.  Accordingly, the damages under the breached lease covenant, to the extent that

they occurred post-petition, provided benefits to the bankrupt estate and were properly accorded

[administrative] priority . . . ."  Id. (citation omitted).

United Trucking suggests that if a debtor-in-possession induces a creditor *post*-petition to

perform and then such performance is rendered to the estate, then the claims of the creditor are

given priority under White Motor.  In other words, when a debtor-in-possession's *post*-petition

action brings about the liability, an administrative claim may arise, and the focus is on

inducement as the key inquiry.  On the other hand, mere continuance post-petition of a *pre*-

petition contract does not involve any "inducement" by the debtor-in-possession, as all

inducement came from the pre-petition debtor before the bankruptcy estate arose.  In the latter

situation, United Trucking seems to require that administrative expenses should reflect actual

value conferred on the bankrupt estate by reason of the wrongful acts or breach of the agreement,

and inducement does not make any difference.

     While a pre-petition/post-petition bright-line test would be appealing, subsequent case

law suggests that United Trucking was not so straightforward.  For example, in In re Cook and

Sons Mining, Inc., 2005 WL 2386238 (Bankr. E.D. Ky. Sept. 28, 2005), United State District

Judge Karen K. Caldwell noted that "[w]hile clearly case law holds that a breach of a post-

petition contract creates an administrative claim, it is also clear that not *all* breaches of post-

petition contracts are afforded administrative priority."  Id. at *8 (citation omitted) (emphasis in

original).  The test utilized by courts is that the claimant must prove that the debt (1) arose from a

transaction with the bankruptcy estate (as opposed to the pre-bankruptcy entity); and (2) directly

and substantially benefitted the estate.  In re Sunarhauserman, Inc., 126 F.3d 811, 815 (6th Cir.

1997).  The Sixth Circuit Bankruptcy Appellate Panel has noted some "exceptions" to this test,

referring to the analysis in United Trucking as carving out an "unjust enrichment" exception –

that the expense " 'should reflect actual value conferred on the bankrupt estate by reason of

wrongful' conduct on the part of the debtor."  In re Economy Lodging Sys., Inc., 234 B.R. 691

(6th Cir. B.A.P. 1999) (quoting United Trucking, 851 F.2d at 162).[6]

### 2. The First Appeal and Opinion After Remand

So, with all this in mind, the Court turns to its opinion in the First Appeal.  There is some language suggesting that the Court had determined that the Agreement was a *pre*-petition lease that Lodestar assumed post-petition by continuing to mine the Pinsons' property:

> [Lodestar's] choice to continue to enjoy the fruits of the coal lease well beyond the . . . relief date constitutes an assumption of the lease, rendering the lease functionally analogous to a postpetition lease.

Use of the term "assumption" and the phrase "functionally analogous to a postpetition lease" suggests this conclusion.  There is other language in the opinion suggesting that the Court determined that the Agreement was a *post*-petition agreement:

> [T]he lease, executed post-petition and assumed post-petition, requires payment under the terms of the settlement agreement and is thus entitled to administrative priority in an amount determined consistent with the approach in *In re United Trucking*.

And there is some language in the opinion suggesting that it does not matter:

> [T]he question of whether the Pinson's claim for the settlement amount is technically a prepetition or postpetition claim is not as important in view of the Bankruptcy Judge's undisputed factual finding number twelve [wherein the bankruptcy court found that Lodestar had continued to mine coal and was current on royalty and wheelage payments, but had made no additional installment payments relating to the "pre-petition Settlement Amount"].

On remand, the bankruptcy court stated that "[t]he unique circumstances of the instant case require a similar analysis of the 'reasonable value of the benefits conferred' by the executory

---

[6]     The Court reads United Trucking to say that any "exception" carved out in that case is to provide for post-petition *damages* in a case involving a *pre*-petition lease.

-14-

agreement between [Lodestar] and the Pinsons." Thus, it seemed to be applying the test

applicable primarily to pre-petition agreements. However, there is also language suggesting that

the bankruptcy court applied the post-petition inducement test from United Trucking:

> The $300,000 that was paid by [Lodestar] to the Pinsons upon execution of the
> Settlement Agreement and prior to commencement of mining under the post-
> petition lease was obviously paid in consideration of the settlement of the
> Pinsons' pre-petition claim for trespass and to induce the Pinsons to enter into the
> coal mining lease to take effect during the following month.

The bankruptcy court then concluded that the remaining $950,000 due in installment payments

"can only logically be attributed to payment for the previously mined coal." Thus, any amount

claimed beyond the $300,000 already paid post-petition conferred no actual value on the

bankruptcy estate, such that the value of the claim was $0. The bankruptcy court also based this

conclusion on the fact that the coal lease in the Agreement specifically stated that no mining

could begin on the property until such time as the $300,000 installment was paid, but made no

mention of the other installment payments.

The question on appeal is whether the bankruptcy court complied with this Court's

directive in its remand opinion and consistent with the approach in United Trucking. While there

is some language to the contrary, the Court's first opinion held that the parties had a post-

petition, integrated Agreement that called for the Pinsons to permit Lodestar to mine and haul

coal on their property in exchange for Lodestar paying royalties and wheelage fees *as well as*

installment payments for the coal already mined.

### 3. *Application of the Administrative Expense Test*

As for the two-part test, it is satisfied in the present case. There is no question that

technically the debt and liability arose post-petition and, thus, the liability arose from a transaction with the estate. The Agreement was not executed until after the bankruptcy petition had been filed and Lodestar did not breach the agreement by failing to pay the additional installment payments until after the bankruptcy petition had been filed. Therefore, the first element is satisfied.

However, the fact that none of the parties knew of the involuntary bankruptcy petition at the time of their negotiation and execution of the Agreement muddies this case somewhat, particularly in light of the purpose of § 503 of the Bankruptcy Code, which "is to encourage third parties to provide the debtor in possession with goods and services essential to rehabilitation of the business." In re Economy Lodging Sys., Inc., 234 B.R. at 697. Lodestar makes much of this fact in its brief, arguing that this policy is not served in the present case because the Pinsons did not know they were dealing with a debtor-in-possession and because all of the negotiations essentially took place with Lodestar prior to the filing of the petition.

While this is an unusual situation and one that is not contemplated by the cases regarding administrative expenses, the Court cannot find anything in the Code or applicable case law that requires the parties to have specific knowledge of the bankruptcy before a claim can qualify as an administrative expense. The only two requirements are "that the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate." United Trucking, 851 F.2d at 161. Nothing in United Trucking requires that the parties in this case must have known of the involuntary bankruptcy in order for the Pinsons' claim to qualify as an administrative expense. To find that this element

-16-

(that the debt arose from a transaction with the bankruptcy estate) is not met because the Pinsons were not aware of the bankruptcy at the time they entered into the Agreement would seem to impose a knowledge requirement where none currently exists.

Further, regardless of whether they knew of the bankruptcy petition, the Pinsons would never have done business with Lodestar at all had it not agreed to pay for the coal already mined. So, it seems to the Court that the policy is not thwarted by allowing the $950,000 as an administrative claim in this case, even if the parties were not aware of the filing of the involuntary bankruptcy when entering into the lease. If landholders such as the Pinsons are not granted administrative priority on their agreements, they would have little incentive to enter into agreements of this type. And punishing a third-party such as the Pinsons because they were not aware of an involuntary bankruptcy petition filed before they entered into such agreement would not further this purpose. Instead, it would send the message that even though a party entered into a transaction with a bankrupt entity and even though that transaction directly and substantially benefitted the estate, the party would not be entitled to protection. See, e.g., In re Merry-Go-Round, 180 F.3d at 158 (noting that if lessors do not receive some assurance that their leases will be paid in full, they will refuse to enter into leases with Chapter 11 entities).

The second element is met as well. There is no question that the Agreement directly and substantially benefitted the estate, as Lodestar benefitted from the over 250,000 tons of coal subsequently mined and hauled over the Pinsons' property[7] and this is exactly the type of

---

[7] The parties dispute the extent to which Lodestar benefitted from the mining of this coal, which dispute centers around Exhibit A to the Pinsons' reply brief. Therein, the Pinsons calculate that these 250,000+ tons of coal resulted in a gross profit to Lodestar of over $8.7 million. Despite the fact that these calculations appear to be based on information provided by Lodestar in its own royalty statements, the Trustee disputes the accuracy of this calculation and

-17-

agreement that Lodestar needed to continue to operate as a going concern.  The question is:  what is the extent of this benefit?  This seems to be where the dispute lies.  Lodestar argues that the Pinsons are only entitled to the reasonable actual value of the benefits conferred, which was the wheelage and royalty payments already made.  The Pinsons argue that they are entitled to the installment payments that the parties agreed to in the Agreement, an Agreement that would not have been made had those installment payments not been included.

The Court finds that the Pinsons are entitled to the $950,000 in unpaid installments.  Lodestar argues that the bankruptcy court was correct that the $950,000 did not confer any actual value on the estate post-petition, but the Court disagrees.  First of all, there would not have been any mining or hauling in the first instance had Lodestar not agreed to make the payments in the Agreement; the entire $1.25 million settlement was the inducement for the Pinsons to sign the Agreement.  Second, Lodestar directly and substantially benefitted from its breach of the Agreement in that the estate had $950,000 to use to continue to fund its operations, money it would not have had in the absence of its breach.  See, e.g., United Trucking, 851 F.2d at 162 (noting that United's failure to abide by its lease obligations "allowed . . . the debtors to use the money saved and not paid for [the creditor's] benefit . . . to continue its operations").

The bankruptcy court makes a distinction between the $300,000 paid upon execution of the Agreement and the remaining $950,000 due in installment payments, but the Court does not believe such a distinction can be made.  The bankruptcy court reasoned that the $300,000 was

---

contends that Lodestar actually lost money on these mining operations (see discussion of motion to strike below).  Therefore, in considering any benefit to Lodestar, the Court relies not on the monetary calculations provided by the Pinsons, but on the tonnage figures found in the royalty statements.

part of the inducement for the coal lease because the coal lease specifically stated that mining and hauling could not *commence* until such payment had been made.  However, this ignores the fact that the coal lease also contemplated that mining would not *continue* unless the additional installment payments were made.[8]  Given the Agreement as a whole, integrated document, the Court sees no difference between the $300,000 already paid, which the bankruptcy court apparently determined was properly paid as an administrative expense (or at least provided some actual value to the estate post-petition), and the $950,000 that had yet to be paid.  Both sums were part of the total $1.25 million settlement agreement and both were required to be paid before the Pinsons would agree to enter into the coal lease in the first place.

The bankruptcy court does not satisfactorily explain why the $300,000 payment was permissible, but the other payments were not.  For example, its opinion stated that the $300,000 was "obviously paid in consideration of the settlement of the Pinsons' pre-petition claim for trespass and to induce the Pinsons to enter into the coal mining lease to take effect during the following month."  However, it does not explain how the remaining $950,000 installment payments differ, except in the timing of their payment.  This appears to be an arbitrary distinction on the part of the bankruptcy court.

Regardless of the test applied – either the "inducement" test or the "benefits to the estate" test – or the standard of review applied, the Court finds that the Pinsons are entitled to the remaining $950,000 in installment payments as an administrative expense.  There is no question

---

[8]        This conclusion is somewhat undermined by the actual events in this case, whereby the Pinsons allowed mining and hauling to continue even after the installment payments were not made.  However, the Court believes it should look at the Agreement not in hindsight, but as of the time it was made.

-19-

that this is a difficult case in terms of the equities.  If this $950,000 is not a priority administrative expense, then the other general unsecured creditors (including the Pinsons) will get at least something from the estate.  If not, then the Pinsons may get paid in full and the other creditors will not get much of anything.  But this is a situation that can be considered only in hindsight now that the case has been converted to a Chapter 7 case.  It is more appropriate to view the overall equities as of the time of the Agreement when it was a Chapter 11 case, particularly in light of the global settlement reached by the parties.

As for the question of which tier the Pinsons' claim belongs in, the bankruptcy court did not address this question below because it found that the $950,000 claim was not entitled to administrative priority.  Now that this Court has reversed that ruling, the bankruptcy court should consider on remand what tier the Pinsons' claim falls into based on the global settlement agreement.

### C.   Motion to Strike

The Trustee has also filed a Motion to Strike Portion of Appellants' Exhibit to Reply Brief [DE #8].  Therein, the Trustee asks the Court to strike pages one through three of Exhibit A to the Pinsons' reply brief because it was not included in the record below or on appeal and the content is disputed by the Trustee.

The Pinsons respond that the pages were included in a "briefing book" provided by the Trustee to the bankruptcy court and were considered by the bankruptcy court in fashioning its opinion below, even if not made part of the record below.  The Pinsons ask the Court to supplement the record to allow the entire exhibit to be considered.  The Trustee replies that the purported calculations contained in the chart prepared as part of the exhibit represent a

completely incorrect assessment of any alleged profit to Lodestar, and it appears to the Trustee that Lodestar may have actually lost money on this particular mining operation.  Because the amount of profit or loss which Lodestar may have sustained on this mine was never at issue, the exhibit is irrelevant.

The Court will permit the Pinsons to supplement the record on appeal with these documents.  As noted above, in this appeal the Court only considered the amount of coal mined from and hauled across the Pinsons' property, not the dollar value that it may have provided to Lodestar, since that amount is in dispute.

## III.   CONCLUSION

Based on the above, the Court, being otherwise fully and sufficiently advised, HEREBY ORDERS that

    (1)    the order of the bankruptcy court entered November 3, 2006, is REVERSED;

    (2)    the Trustee's motion to strike [DE #8] is DENIED;

    (3)    the record on appeal is supplemented to include the entirety of Exhibit A as attached to the Pinsons' reply brief;

    (4)    this matter shall be REMANDED to the bankruptcy court for further action consistent with this opinion and order;

    (5)    this matter is STRICKEN from the active docket of the Court; and

    (6)    this is a final and appealable order.

This September 27, 2007.



**Signed By:**

**_Karl S. Forester_**   *KSF*

**United States Senior Judge**

-21-